J. VINCENT KEOGH and ROSEMARY B. KEOGH, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent.
Keogh v. Commissioner
Docket No. 1666-67
United States Tax Court
T.C. Memo 1975-197; 1975 Tax Ct. Memo LEXIS 174; 34 T.C.M. (CCH) 844; T.C.M. (RIA) 750197; June 23, 1975, Filed Philip Handelman and Robert M. Trien, for the petitioners. Larry Kars, for the respondent. SCOTT MEMORANDUM FINDINGS OF FACT AND OPINION SCOTT, Judge: Respondent determined deficiencies in petitioners' Federal income taxes for the calendar years 1959, 1960, and 1961 in the amounts of $916.58, $592.08, and $13,100.85, respectively, and an addition to tax under section 6653(b), I.R.C. 1954, [1] for the calendar year 1961 in the amount of $6,550.42. The issues for decision are: (1) Whether J. Vincent Keogh is *175 collaterally estopped from denying receipt of income in the calendar year 1961 in connection with conspiracy to obstruct justice because of his conviction by the United States District Court for the Southern District of New York of conspiracy to obstruct or impede the due administration of justice in violation of 18 U.S.C. 1503, which conviction was affirmed by the United States Court of Appeals for the Second Circuit, 317 F. 2d 459 (2d Cir. 1963), with certiorari being denied, 375 U.S. 836 (1963). (2) Whether J. Vincent Keogh received the amount of $22,500 from Robert M. Erdman in the taxable year 1961. (3) Whether J. Vincent Keogh is liable for the addition to tax for fraud under section 6653(b) for the taxable year 1961. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. Petitioners, husband and wife who resided in Brooklyn, New York at the time their petition in this case was filed, filed joint Federal income tax returns for the calendar years 1959, 1960, and 1961 with the district director of internal revenue, Brooklyn, New York. J. Vincent Keogh (hereinafter referred to as petitioner) *176 began the practice of law in New York in 1936 and with the exception of 4 years of service in the United States Navy, engaged in legal practice in New York until 1946. From 1946 through 1950 petitioner served as United States attorney for the Eastern District of New York. He resigned from this position in 1950 to run for the Supreme Court of New York in November of that year. He was elected to the Supreme Court and served as a judge of the Supreme Court of the State of New York from 1951 through December 7, 1961. When he first became a judge of the Supreme Court of New York, petitioner was assigned to the division of that court that heard equity and matrimonial cases, as well as negligence and incompetency cases as certified by Kings County Hospital. In late 1955 or early 1956, he was designated by the Appellate Division of the Second Department to Special Terms. In that assignment he was in charge of a combination in the Boroughs of Richmond, Kings, and Queens, of incompetence estates and mortgage litigation, as well as condemnation proceedings. It was his custom to physically examine properties to be condemned prior to hearings and generally he would make such examination from *177 approximately 9 o'clock to 9:40 in the morning before going on the bench at 10 o'clock. In 1956 petitioner was suffering from a problem with a disc in his back. A young lawyer who practiced before him noticed his difficulty in walking and suggested to him that he see a Dr. Robert M. Erdman (hereinafter referred to as Erdman), who practiced as an orthopedist in Manhattan. Petitioner's home and chambers were in Brooklyn, and the young lawyer who had suggested to petitioner that he see Erdman drove him to Erdman's office. Petitioner had previously heard of Erdman since Erdman had testified as an expert witness in negligence cases before the Supreme Court of New York but had not testified in any of the cases which petitioner heard. Erdman examined petitioner and had certain x-rays taken and prescribed a form of medicinal treatment for petitioner which alleviated his pain and discomfort. Petitioner saw Erdman professionally three or four times in 1956 and thereafter only saw him professionally one time when he had a touch of bursitis, and Erdman arranged for him to have some x-ray treatments. However, petitioner saw Erdman regularly since whenever Erdman was in the Supreme Court building *178 in Brooklyn, which was the building in which petitioner had his chambers and was sitting at the time he met Erdman, he would stop in petitioner's courtroom and come in and visit him during his court recess. During these visits petitioner and Erdman became friends and informed each other about their families. Petitioner at that time and continuing until the title was closed on property he purchased in Great Barrington, New York, in May of 1960, was interested in property in Great Barrington. At that time there was inadequate train service between Brooklyn and Great Barrington, and on two or three occasions between 1956 and 1961, Erdman's chauffeur drove petitioner to Great Barrington in Erdman's Cadillac with a telephone at the suggestion of Erdman. Erdman's wife had studied law but had not passed the bar examination, and when Erdman told petitioner this fact, petitioner suggested that Erdman's wife could come in to his court and come in to his chambers afterwards and let some of his employees explain the work they were doing to her since petitioner felt this might help her become familiar with court procedures and help her to pass the bar examination. Erdman's wife accepted this *179 offer and did later pass the bar examination. After petitioner purchased some property in Great Barrington, he began to have the house remodeled and Erdman became interested in the work petitioner was having done at Great Barrington. When petitioner began having work done on the property in Great Barrington, he mentioned to Erdman that he needed funds for the purchase of materials and to pay for labor, and around the end of June of 1960 Erdman lent him $1,500. Later in the summer of 1960, Erdman lent petitioner an additional sum of $1,000. Petitioner and his family spent the summer of 1960 on the property in Great Barrington and completed a master plan for remodeling of the Great Barrington property. Petitioner had an architect draw up the master plans for this remodeling. Elliott Kahaner was the Chief Assistant United States Attorney for the Eastern District of New York in early 1961 and had been for sometime prior thereto. Petitioner had assisted Kahaner in obtaining his appointment. Erdman had known Kahaner for sometime prior to 1961. In early January 1961 Erdman's accountant told Erdman that his cousin, Sanford J. Moore (hereinafter referred to as Moore) was in some form *180 of difficulty and that the case was in the United States attorney's office. Erdman told his accountant that he knew Kahaner in the United States attorney's office and would call Kahaner and talk to him. Erdman called Kahaner and told him that his accountant was there and that there was some case pending in Brooklyn which his accountant wanted to talk to him about. Kahaner told Erdman to send the accountant over and that he would call him back. Later in January 1961 Kahaner called Erdman back and said that he could do something for the accountant's cousin, but that he wanted $35,000. When Erdman reported this to his accountant, the accountant brought Moore to see Erdman and this was the first time Erdman had met Moore. Erdman told his accountant and Moore about his conversation with Kahaner. In the latter part of February Moore came to Erdman's office with an envelope containing money and Erdman called Kahaner and told him that Moore was in the office and had something for him and for him to come there. Kahaner told Erdman he would be over in 20 minutes and Moore left the envelope with Erdman and Kahaner came over and took the envelope and left. In the early part of March, Kahaner *181 reported to Erdman that the judge who would normally have had the case involving Moore would not have it since there had been a change of judges for the month, and Judge Rayfiel would be handling Moore's case. At this point Erdman suggested that they terminate "this whole thing" and Kahaner return the money. Kahaner, however, suggested that Erdman talk to petitioner and also stated that he wanted more money. Erdman relayed this conversation to Moore, and Moore again came to Erdman's office with an envelope containing money. This was in the early part of March 1961. Erdman called Kahaner and told him he had something for him and Kahaner came over and took the envelope with the money. In the meantime Erdman had talked to petitioner and relayed to him the information he had received from Kahaner that Judge Rayfiel was to sit a month ahead of the time he had previously been scheduled to sit on criminal cases. Erdman told petitioner that his accountant's cousin was in some sort of business difficulty and that the case was in the Eastern District and Kahaner had it. Petitioner told Erdman to bring a copy of the indictment for him to read and Erdman obtained a copy of the indictment and *182 shortly thereafter took the copy to petitioner. Petitioner looked at the indictment and stated that this was a business problem, and then proceeded to talk about his home at Great Barrington. Petitioner wrote the following on a card and handed it to Erdman: Bath #1
$2,989
Dining Rm
2,508
Enclose Patio
1,970
Bath #2
1,560
$9,027 Petitioner then discussed with Erdman the fact that he needed a car and Erdman thought he had said a "Templar," and in his own handwriting at the bottom of this card wrote the word, "Templar." Erdman got the clear impression that the figures written on the card were amounts that petitioner needed in connection with his remodeling of the Great Barrington home and wanted in order to attempt to help Moore out of his difficulties, and that in addition he wanted money to buy an automobile. At that time petitioner had a 1959 Dodge automobile which Erdman had given him as a present and petitioner generally changed cars every 2 years. Erdman took the card which had been handed to him by petitioner and showed it to Moore. He told Moore that the money would have to be paid. Thereafter, Moore came to Erdman's office with two envelopes, one of *183 which was for Kahaner. Each of these envelopes contained money, the total sum in the two envelopes being $10,000. On February 24, 1961, Moore was indicted on charges of violation of the National Bankruptcy Act, and it was the indictment in this case which Erdman had shown to petitioner. During the first week in March, shortly after Moore brought the two envelopes containing in total $10,000 to Erdman's office, Erdman took the envelope which had not been picked up by Kahaner to petitioner's chambers and handed it to petitioner and asked petitioner how the Moore case was coming. Petitioner gave Erdman a card with $3,500 written on it. Thereafter Erdman talked with Kahaner and told him that he could not expect Moore to pay any more money than $35,000, and since Kahaner had introduced petitioner, anything given him would have to come from the $35,000. On March 28, 1961, Moore came to Erdman's office with $20,000 and Erdman told Moore to keep it and bring it back the next day since he was not in a position to see Kahaner or petitioner on that day. On March 29, 1961, Moore came to Erdman's office, again bringing the $20,000. Moore and Erdman drove in Moore's car to a luncheonette not *184 far from the building in which petitioner's chambers were located and met Kahaner. While Erdman and Moore were driving to the luncheonette in Brooklyn to meet Kahaner, Erdman told Moore that most of the money should go to petitioner, and that Kahaner should not get more than $2,500. It was on this basis that Moore took $2,500 of the $20,000 in the envelope to hand to Kahaner. After some talk Moore gave Kahaner $2,500 and Kahaner left. Then Moore and Erdman got into Moore's car and when Moore started to drive away from the building in which petitioner's chambers were located Erdman told him to go to the New York Supreme Court building. It was at that time that Moore learned that the judge to whom Erdman was referring when he told him some of the money was going to the judge was not Judge Rayfiel, but rather was petitioner. Moore parked his car near the New York Supreme Court building and Erdman got out of the car and went into the building while Moore sat in the car. Before Erdman went into the Supreme Court building, Moore gave him the envelope containing the $17,500 balance of the $20,000 and Erdman went to petitioner's chambers and handed him the envelope containing the $17,500 *185 and asked him how the Moore case was coming. Petitioner called Judge Rayfiel while Erdman was there to arrange for lunch that day at the Brooklyn Club. Judge Rayfiel was the judge who would sentence Moore on a guilty plea by Moore. Petitioner canceled another luncheon in order to have lunch with Judge Rayfiel. Petitioner had lunch with Judge Rayfiel on March 29, 1961, and at the luncheon told Judge Rayfiel that his friend, Erdman, was interested in somebody named Sanford Moore. Judge Rayfiel knew Erdman. Erdman had been a witness in certain cases which he had heard. After petitioner mentioned Moore's name to Judge Rayfiel, Judge Rayfiel told petitioner that it was one of the worst bankruptcy cases he had had any connection with and not to mention Moore's name to him again. After his conversation with Judge Rayfiel, petitioner relayed the substance of the conversation to Erdman and Erdman told Moore the substance of petitioner's conversation with Judge Rayfiel. After talking to Moore on the afternoon of March 29, 1961, and relaying the information he had received from petitioner, Erdman called petitioner back and petitioner told Erdman that he had arranged an appointment for him *186 with Judge Rayfiel for the next morning, March 30, 1961. On the morning of March 30, Erdman went to Judge Rayfiel's chambers and told Judge Rayfiel that he was interested in Moore and did not think Moore should be judged by what other people said and that Moore was a good family man. Judge Rayfiel stated to Erdman that this was a bad bankruptcy case. After Erdman left Judge Rayfiel's chambers, he went back to see petitioner and took with him a lawyer named Becker. Erdman and Becker went in to see petitioner and Erdman told petitioner what Judge Rayfiel had said to him. Petitioner stated that he was going to call Judge Rayfiel again and at that point Erdman suggested that Becker leave petitioner's chambers which Becker did. Petitioner called Judge Rayfiel but the discussion did not deal with the Moore case. Petitioner stated to Erdman that he was annoyed that Judge Rayfiel could not do him a favor since he at one time had done something for Judge Rayfiel's son. On March 30, 1961, Moore was sentenced by Judge Rayfiel to 3 years in prison. After the sentencing Moore reported to Erdman about the sentencing. Erdman then called petitioner and asked petitioner for help but asked him not *187 to talk to Judge Rayfiel right away but to let him cool off a bit. On April 12, 1961, Moore talked with Kahaner. Kahaner told Moore that he had tried to help him but the "thing had blown up" and he suggested that Moore have his lawyer make a motion to withdraw his guilty plea on a technical ground. Kahaner told Moore that he was to have lunch with petitioner, and that petitioner was going to try to help Moore with Judge Rayfiel. On May 10, 1961, Moore, Erdman, and an individual named Gabe Forman had a meeting with petitioner in his chambers. Erdman at that meeting told petitioner that he had to help Moore, that Moore was a good friend of his and explained that Gabe Forman was a good friend of Moore's and that is why he was in the meeting. Petitioner told Erdman that he was going to try to help Moore. At that time Moore was attempting to withdraw his guilty plea. Since he had been sentenced to 3 years, he wanted to withdraw that plea. There was also some discussion about petitioner's getting in touch with the trustee in bankruptcy and telling him that Erdman was willing to endorse notes of Moore's for restitution if the trustee would go along with that idea. Erdman arranged a meeting *188 with Moore, petitioner, the trustee, and himself in petitioner's chambers for May 22, 1961. A proposed letter from Moore's attorney, Becker, was shown to the trustee and to petitioner whereby $50,000 in notes were offered to the trustee in return for the reduction of Moore's sentence or withdrawal of Moore's guilty plea. Petitioner went over the proposed letter and commented on something which was in it that he thought would antagonize Judge Rayfiel and said that that paragraph should be deleted. Petitioner told the trustee that Erdman was a friend of his and whatever the trustee could do would be appreciated. During the latter part of May 1961, Erdman and Moore were discussing a business of Moore's in Baltimore, Maryland, in which Erdman also had an interest and Gabe Forman had an interest. Moore asked Erdman to call petitioner to find out what was happening. Erdman did call petitioner and asked whether he should sign the $50,000 worth of notes, stating that he wanted to make sure if he signed them, that Moore wasn't going to jail because he needed Moore to help him with his business so that Moore could pay back the money on the notes. After the conversation which Erdman had with *189 petitioner, he signed the $50,000 of notes which Moore had offered the trustee for restitution. On April 12, 1961, petitioner purchased a Pontiac Tempest automobile. On June 28, 1961, petitioner was still having work done on his house at Great Barrington and Erdman lent him an additional $1,000 to use to pay electricians and for appliances. On July 17, 1961, Erdman called petitioner at his chambers and suggested that petitioner send one of his law clerks over to Erdman's office in Manhattan to pick up some vitamins for petitioner. Erdman stated that he thought petitioner's supply was running short and that he had some he had gotten from a pharmaceutical house. Petitioner sent one of his law clerks over to Erdman's office and just before petitioner was leaving for the day the law clerk returned with the vitamins, and in addition to the medication handed him an envelope which contained a $500 check from Erdman. Petitioner handed the check to his law clerk and asked the law clerk to deposit it for him. Petitioner was not surprised at receiving the check because he knew that Erdman knew the amount of the expenditures he had made on the house at Great Barrington to the end of June. *190 On December 7, 1961, petitioner was indicted for conspiring with Elliott Kahaner, Robert M. Erdman, Sanford J. Moore, and others to obstruct or impede the due administration of justice. The indictment which was returned in the Southern Judicial District of New York set forth the following charges and overt acts: The Grand Jury charges: 1. From on or about the 1st day of January 1960, and continuously thereafter up to and including the date of the filing of this indictment, in the Southern District of New York and elsewhere, ELLIOTT KAHANER, ANTONIO CORALLO, ROBERT M. ERDMAN, JAMES VINCENT KEOGH and SANFORD J. MOORE, defendants herein, and Allen Kerner, Sherwood Schwach, Jacob Walter Cohen, Alvin Needleman, Seymour Deutsch and Louis D. Forman, named herein as co-conspirators but not as defendants, unlawfully, wilfully and knowingly did combine, conspire, confederate and agree together and with each other, and with various other persons whose names are to the Grand Jury unknown, to commit an offense against the United States, to wit, to violate Section 1503, Title 18, United States Code. 2. It was a part of said conspiracy that said defendants and co-conspirators unlawfully, *191 wilfully and knowingly would corruptly influence, obstruct, and impede, and would corruptly endeavor to influence, obstruct, and impede, the due administration of justice in the United States Judicial District for the Eastern District of New York. * * *
4. Among the means by which the defendants and co-conspirators would carry out the aforesaid conspiracy were the following: * * *
E. Defendants SANFORD J. MOORE and ANTONIO CORALLO and co-conspirator Louis D. Forman would and did obtain and cause to be obtained approximately $35,000, which they would and did deliver and cause to be delivered to defendant ROBERT M. ERDMAN. F. Defendants ELLIOTT KAHANER and ANTONIO CORALLO would and did cause defendant ROBERT M. ERDMAN to communicate with defendant JAMES VINCENT KEOGH, who was, at all times during the conspiracy described herein, a Justice of the Supreme Court of the State of New York, County of Kings; and ROBERT M. ERDMAN and JAMES VINCENT KEOGH would and did agree that JAMES VINCENT KEOGH would attempt to obtain suspended or light sentences for defendant SANFORD J. MOORE and any of his co-defendants in the criminal proceedings described in paragraph 3. G. Defendant *192 ROBERT M. ERDMAN would and did deliver and cause to be delivered a portion of said sum of approximately $35,000 to defendant ELLIOTT KAHANER and the remaining portion of said sum to defendant JAMES VINCENT KEOGH. * * *
OVERT ACTS
In furtherance of said conspiracy and to effect the objects thereof, the defendants and co-conspirators herein did commit, among others, the following overt acts: * * *
7. In or about the month of March, 1961, in the Eastern District of New York, defendants ROBERT M. ERDMAN and JAMES VINCENT KEOGH had a meeting. * * *
9. On or about March 29, 1961, in the Eastern District of New York, the defendants ROBERT M. ERDMAN and JAMES VINCENT KEOGH had a meeting. On August 2, 1962, following a jury trial before Judge Edward Weinfeld, petitioner was convicted of conspiring with Elliott Kahaner, Antonio Corallo, Robert M. Erdman, Sanford J. Moore, and six others to obstruct or impede the due administration of justice in violation of 18 U.S.C. 1503. Judge Weinfeld, in his charge to the jury at petitioner's trial, stated in part as follows: You should note here that it is not illegal or improper, in and of itself, for *193 one to request consideration or leniency from a federal judge for a person about to be sentenced by that federal judge; nor is it wrong to submit to him background information concerning a person about to be sentenced, provided this is done without a corrupt endeavor or purpose. Thus, you may not find that Keogh agreed to enter a conspiracy to corruptly endeavor to obstruct or impede the due administration of justice merely from the fact that Keogh agreed to and did speak to Judge Rayfiel. However, if you find that Keogh asked Judge Rayfiel for leniency or consideration for Moore - supposedly for disinterested reasons - that he was merely speaking for a friend's friend - though actually in return for cash payment he received from Erdman on behalf of Moore for that purpose, then you have sufficient to find that that endeavor was corrupt and, further, that he was a member of the conspiracy here charged, provided you also find all the other essential elements thereof are established. He would, in that case, be working for his own financial gain while he pretended to give disinterested information. * * *
On the other hand, if you should find that no cash payment was made to *194 Keogh or Kahaner - as Erdman and Moore testified was made - then on the evidence here presented, there would be no basis for a finding of corrupt endeavor. All counsel agree that the central and basic issue in the case is whether the money was paid over to Keogh or Kahaner. * * *
If you find that the testimony of any one of these accomplices was deliberately untruthful, you should unhesitatingly reject it. Indeed, if you do not believe these witnesses, particularly Erdman and Moore, I would say you should acquit the defendants, since the structure of the Government's case in large measure rests upon their testimony. * * *
In substance, this is telling you the same thing that I have tried to tell you several times: if you do not accept and are not satisfied beyond a reasonable doubt of the testimony of both Erdman and Moore, then you should acquit. Of course, there is a further instruction. If you are satisfied upon the whole case that the government has sustained its burden of proof, then you should convict. The conviction was appealed to the United States Court of Appeals for the Second Circuit and affirmed in United States v. Kahaner, et al.,317 F. 2d 459 (2d Cir. 1963), *195 and certiorari was denied by the United States Supreme Court (375 U.S. 836 (1963)). On May 10, 1967, petitioner filed before Judge Weinfeld a petition for writ of error coram nobis on the ground that the prosecution knowingly suppressed exculpatory evidence and used and sponsored perjured testimony. Judge Weinfeld denied the application without a hearing by a decision dated July 14, 1967, and this decision was affirmed by the United States Court of Appeals for the Second Circuit on February 2, 1968, except insofar as the petition charged that the prosecutors deliberately suppressed an FBI report concerning the finances of Erdman and his wife, on which the Second Circuit remanded the decision for evidentiary hearing on that issue. United States v. Keogh,391 F. 2d 138 (2d Cir. 1968). After an evidentiary hearing, Judge Weinfeld, on September 5, 1968, held that the evidence established that the funds deposited in Erdman's bank account in February 1961 could not have been proceeds of "bribe money" and that there had been no conscious or deliberate withholding of the FBI report by members of the prosecution staff. United States v. Keogh,289 F. Supp. 265 (S.D. N.Y. 1968). *196 Petitioner appealed this decision to the United States Court of Appeals for the Second Circuit which affirmed the District Court and dismissed the petition for writ of error coram nobis without prejudice to petitioner's filing an additional petition with respect to alleged suppression of FBI reports which had been turned over to petitioner during the course of the evidentiary hearing held before Judge Weinfeld. United States v. Keogh,417 F. 2d 885 (2d Cir. 1969). Petitioner filed another petition for writ of error coram nobis and Judge Weinfeld denied the petition without a hearing. United States v. Keogh,316 F. Supp. 921 (S.D. N.Y. 1970). Petitioner appealed this decision and the United States Court of Appeals for the Second Circuit affirmed the decision. United States v. Keogh,440 F. 2d 737 (2d Cir. 1971). On July 13, 1972, the Supreme Court, Appellate Division, Second Department, disbarred petitioner. In Re Keogh,334 N.Y.S. 2d 43 (1972). Petitioner on his Federal income tax returns for each of the years 1959, 1960, and 1961 claimed deductions for real estate taxes and New York State taxes and for *197 the years 1959 and 1960 deductions for other miscellaneous expenses, and on his return for the year 1961 did not report any amount of income from sums received from Erdman or in connection with any intervention on behalf of Moore. Respondent in his notice of deficiency to petitioner disallowed the following deductions for the years 1959, 1960, and 1961: Deductions Disallowed
1959
1960
1961
Real estate taxes
$ 340.80
$ 86.20
$ 310.60
New York State taxes
853.95
1,121.95
1,304.49
Other miscellaneous
936.83
168.77
0
Totals
$2,131.58
$1,376.92
$1,615.09
Respondent explained this disallowance as being for lack of substantiation and/or as being of a personal nature. For the year 1961 respondent in addition increased petitioner's reported income by $22,500 with the explanation that it had been determined that petitioner had additional unreported income in that amount for the taxable year ended December 31, 1961. Respondent asserted an addition to tax under section 6653(b) in the amount of $6,550.42 for the year 1961. On brief, respondent conceded that petitioner should be allowed deductions for real estate taxes for the year 1959 in the amount *198 of $340.80 and for the year 1961 in the amount of $340.60, and that petitioner was entitled to deductions for New York State taxes in the amount of $995.11, $1,121.99, and $1,107.86 for the years 1959, 1960, and 1961, respectively. Respondent further agreed that there is no addition to tax pursuant to section 6653(b) for the year 1961 with respect to Rosemary B. Keogh. Petitioner introduced no evidence with respect to the disallowance of deductions of any items disallowed for the years here in issue which respondent had not conceded to be allowable. Respondent by amended answer filed November 8, 1973, alleged that petitioner's prior criminal conviction under 18 U.S.C. 1503 is conclusive and binding upon the petitioner and that by reason thereof petitioner is estopped in this case under the doctrine of collateral estoppel from denying that he did not in fact receive the $22,500 of payment in March of 1961. Respondent in his brief argues that petitioner is collaterally estopped from denying that he received some payment in connection with the conspiracy for which he was convicted in March 1961. OPINION Respondent's first contention is that petitioner is *199 collaterally estopped by the judgment of the United States District Court convicting him of violation of section 1503 of title 18 U.S.C. from denying that he received some funds in 1961 for agreeing to attempt to intercede for Moore in Moore's indictment for violation of the Bankruptcy Act. Petitioner argues that had the case been a charge of bribery and had petitioner been convicted of bribery, there might be merit to respondent's position but here the charge was conspiracy and petitioner could have been convicted of conspiracy without the jury necessarily finding that he received any monies. Petitioner further argues that it is only in unusual situations that a judgment of conviction in a criminal case can create an estoppel in a civil proceeding because the "parties are not the same and different rules of evidence are applicable." We have recognized that estoppel by judgment applies in a civil case from a verdict in a criminal case. Hugh B. Monjar,13 T.C. 587, 614 (1949). In that case we quoted from the Supreme Court case of Frank v. Mangum,237 U.S. 309 (1915) that [it] is a fundamental principle of jurisprudence, arising from the very *200 nature of courts of justice and the objects for which they are established, that a question of fact or of law distinctly put in issue and directly determined by a court of competent jurisdiction cannot afterwards be disputed between the same parties. * * * This Court has recognized in recent cases that a criminal conviction can operate as collateral estoppel in a subsequent civil case and that the United States as the party prosecutor in the criminal case is the same party as the Commissioner in the civil case. John W. Amos,43 T.C. 50 (1964), aff'd. 360 F. 2d 358 (4th Cir. 1965); and Artic Ice Cream Co.,43 T.C. 68 (1964). We therefore reject petitioner's contention that the parties are not the same and that because of the conspiracy case being a criminal case, it cannot operate as collateral estoppel in the civil case. This leaves us with the question of whether in fact the judgment in the conspiracy case does estop petitioner in this case from denying that he received some payment from Erdman for his intercession on behalf of Moore. The Supreme Court in Commissioner v. Sunnen,333 U.S. 591 (1948) set forth the *201 basic requirement for the application of collateral estoppel in tax cases. In that case the Court pointed out that where the cause of action is the same, resjudicata applies to put an end to that litigation between the parties absent fraud or some other factor invalidating the judgment, but where the second action between the same parties is based on a different cause or demand the principle is much more narrowly applied. The Court further stated (at 598): In this situation, the judgment in the prior action operates as an estoppel, not as to matters which might have been litigated and determined, but "only as to those matters in issue or points controverted, upon the determination of which the finding or verdict was rendered." Cromwell v. County of Sac, supra, 353 of 94 U.S. And see Russell v. Place, 94 U.S. 606, 24 L.Ed. 214; Southern Pacific R. Co. v. United States, 168 U.S. 1, 48, 18 S.Ct. 18, 27, 42 L.Ed. 355; Mercoid Corp. v. Mid-Continent Co., 320 U.S. 661, 671, 64 S.Ct. 268, 273, 88 L.Ed. 376. Since the cause of action involved in the second proceeding is not swallowed by the judgment in the prior suit, the parties are free to *202 litigate points which were not at issue in the first proceeding, even though such points might have been tendered and decided at that time. But matters which were actually litigated and determined in the first proceeding cannot later be relitigated. Once a party has fought out a matter in litigation with the other party, he cannot later renew that duel. In this sense, resjudicata is usually and more accurately referred to as estoppel by judgment, or collateral estoppel. See Restatement of the Law of Judgments, sections 68, 69, 70; Scott, "Collateral Estoppel by Judgment," 56 Harv.L.Rev. 1. Considering this definition of collateral estoppel and applying it to the facts here, we agree with respondent that petitioner is estopped to deny that he received some funds for his effort on behalf of Moore. The indictment shows that the receipt of funds was a specific charge and the charge of the judge to the jury makes it clear that without receipt of funds petitioner's acts would not be illegal under the indictment. Petitioner argues that under the judge's charge, if the jury thought that Kahaner received funds they could find petitioner guilty. In our view the charge *203 read as a whole, particularly with reference to believing the testimony of Moore and Erdman, precludes any such interpretation. Since a finding that petitioner must have received funds was necessary for the jury to convict, it was, in the words of the Sunnen case, a matter "actually litigated and determined" in the criminal case. A finding of the receipt of some money was essential to a finding of guilt of petitioner in the criminal case or, in the words of Sunnen, a question of fact "essential to the judgment." We therefore hold that petitioner is collaterally estopped to deny that he received funds from Erdman in 1961. See Hugh B. Monjar,supra.
It is clear that the amount which petitioner received was not essential to the judgment of conviction in the criminal case. However, the amount received by petitioner is a necessary determination in the instant case since petitioner's tax liability is based on the amount received. For this reason we have recited in detail the facts which we find from the evidence in the case. In our view the evidence is clear and convincing that on March 29, 1961, petitioner received $17,500 in cash from Erdman. The evidence *204 is also clear and convincing that petitioner received an envelope containing some cash from Erdman during the early part of March 1961. There is a reasonable inference that this envelope contained $5,000 although the evidence in this record is not precise since there is no clear showing that each of the two envelopes, the two containing a total of $10,000, contained an amount of $5,000. However, petitioner has not carried the burden of showing that the amount he received in early March 1961 was not $5,000. In making the findings we have made and in arriving at the conclusion we have reached, we have considered petitioner's testimony that he received no cash from Erdman and petitioner's various arguments attempting to discredit Moore's testimony with respect to turning over the cash, and Erdman's testimony as to passing the cash on to petitioner. Upon consideration of all the evidence and the extensive cross-examination of both Moore and Erdman, we believe the testimony of Moore and Erdman. In our view other evidence buttresses the testimony of Moore and Erdman. The action of petitioner in borrowing further amounts from Erdman after his attempt to intercede on behalf of Moore, the *205 fact that after his conversation with Judge Rayfiel, in which Judge Rayfiel referred to Moore's case being a bad bankruptcy case, petitioner's continued efforts to assist Moore, all buttress the testimony of Moore and Erdman with respect to payments made to petitioner. The issue here is purely factual and no extensive recitation of the facts set forth in our findings is necessary. We also sustain respondent in his addition to tax for fraud. In our view the evidence of the payment to petitioner of the $17,500 is clear and convincing. A man of petitioner's background and education could not have been unaware of the necessity of including such a payment in his taxable income. We therefore sustain respondent's determination of the addition to tax for fraud under section 6653(b). Decision will be entered under Rule 155.
Footnotes
1. All references are to the Internal Revenue Code of 1954, unless otherwise stated.↩