T.C. Memo. 1996-287

UNITED STATES TAX COURT

STEVEN J. ROMER, Petitioner <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 4695-94.                    Filed June 20, 1996.

Steven J. Romer, pro se.

<u>Elizabeth P. Flores</u> and <u>Lyle B. Press</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

SWIFT, <u>Judge</u>:  Respondent determined deficiencies in petitioner's Federal income taxes, additions to tax, and penalties as follows:

| | | Additions to Tax and/or Penalties | | | |
|---|---|---|---|---|---|
| Year | Deficiency | Sec. 6651(a)(1) | Sec. 6653(b)(1) | Sec. 6661 | Sec. 6663 |
| 1988 | $ 208,798 | -- | $156,599 | $52,200 | -- |
| 1989 | 1,418,713 | $354,678 | -- | -- | $1,064,035 |
| 1990 | 696,518 | -- | -- | -- | 522,389 |

Unless otherwise indicated, all section references are to the Internal Revenue Code, and all Rule references are to the Tax Court Rules of Practice and Procedure.

The primary issues for decision are: (1) The collateral estoppel effect of petitioner's State court conviction for embezzlement; (2) the amount of income petitioner received by embezzling funds from his legal clients and the amount of income petitioner received from a check-kiting scheme; and (3) whether petitioner is liable for a fraud addition to tax for 1988 and fraud penalties for 1989 and 1990.

## FINDINGS OF FACT

Many of the facts have been stipulated and are so found. Petitioner resided in New York at the time of the filing of his petition.

During the years in issue, petitioner was a practicing attorney in New York State.

### $741,065 Received From Gabrielle Votano

In 1988, petitioner established a trust on behalf of Gabrielle Votano (Votano) into the corpus of which was

transferred $741,065 in life insurance proceeds that Votano inherited from her father.  Petitioner was designated as trustee of this trust, and it was intended by Votano that petitioner use the $741,065 to purchase for the trust a suitable investment approved by Votano.

On November 9, 1988, petitioner transferred the $741,065 received from Votano into a "special" checking account in his name at Chemical Bank.  The $741,065 was not transferred into one of petitioner's client escrow accounts.

On or about November 10, 1988, petitioner purchased with the $741,065 two certificates of deposit at Chemical Bank -- one in the amount of $341,065 and the other in the amount of $400,000.  Although not completely clear from the record, it appears that these certificates of deposit were purchased in the name of petitioner, not in the name of the Votano trust.

On October 9, 1990, Votano delivered a letter to petitioner in which she asked that her trust be terminated.  Petitioner informed Votano that the two certificates of deposit that he had purchased with the $741,065 had just been renewed and therefore that the funds were not readily available.

On or about January 3, 1991, Votano received from petitioner a letter in which petitioner falsely claimed, among other things, that he had been diagnosed with an inoperable and incurable brain tumor and that he had only 2 months to live, and petitioner correctly acknowledged in the letter that Votano's $741,065 was

no longer available.  Petitioner's letter explains, in part, as follows:

>        To get right to the point, your money is no longer available, I'm sorry to say.  I did, however, take out a very large life insurance policy, $23 million, just before my condition was diagnosed.  If you make a fuss or contact the authorities, the insurance company will use it as an excuse to claim fraud and avoid paying the face of the policy.  You will be paid in full in a very short time.
>
>        By a similar letter I have informed my wife of this obligation * * *. * * *
>
>        I used the money to feed some hungry and poverty-stricken people.  It didn't go into my home or family.  In fact, my home is mortgaged for about twice of what it is worth.  Your only method of being repaid is through the life insurance.  I deeply regret the whole episode.
>
>        Please don't and ask your attorney to not contact Chemical Bank.  It will do you no good, since there is no money there and the insurance company will use that as an excuse to not pay the policy.

Neither Votano nor the trust ever received back from petitioner any portion of the $741,065.  As a result of the loss of the $741,065, Votano received $100,000 from the New York State Lawyers' Fund for Client Protection.

### $450,000 Received From William Marion's Family Trusts

At the request of William Marion, a long-time legal client, petitioner, in 1974, established a family trust on behalf of the two daughters and one son of William and Lillian Marion.  In 1985, again at the request of William Marion, petitioner

established another trust on behalf of Joseph Marion, the only son of William and Lillian Marion.

Both trusts were funded with stock in the William Marion Co., a closely held corporation controlled by the Marion family (the family corporation). The corporate stock to be held in the two trusts was to be conveyed to the Marion children 10 years after the death of William and Lillian Marion. These trusts will be referred to hereinafter collectively as the Marion Family Trusts.

From the time of formation of the Marion Family Trusts until early 1989, petitioner and the accountant for the Marion family were co-trustees on each of the trusts. In February of 1989, petitioner became sole trustee of the Marion Family Trusts. Petitioner was not authorized to use any of the trust property for his personal purposes.

In early 1989, William and Joseph Marion and the other family members agreed to sell the stock in the family corporation that was held by the Marion Family Trusts for $6.1 million in cash. Upon closing of the sale on or about March 7, 1989, and after cash disbursements of $2,013,000 were made to William and Lillian Marion, petitioner was to transfer the $4,087,000 balance of the sales proceeds into checking accounts in the name of the Marion Family Trusts. William Marion instructed petitioner to purchase for the trusts certificates of deposit having a 3-month maturity.

Petitioner, however, transferred the $4,087,000 balance of the sales proceeds into a "special" checking account in his name at Chemical Bank. The Marion Family Trusts were not reflected on Chemical Bank's records as having an interest in the account. The account into which the $4,087,000 was transferred did not constitute one of petitioner's client escrow accounts.

On or about March 7, 1989, using the $4,087,000 that had been obtained from the Marion Family Trusts and that had been transferred by petitioner into a checking account at Chemical Bank, petitioner purchased two certificates of deposit at Chemical Bank in the respective amounts of $2,501,000 and $1,586,000, in the name of "Steven J. Romer, Trustee," not in the name of the Marion Family Trusts.

Occasionally, petitioner forwarded payments to the Marion children, as beneficiaries of the Marion Family Trusts, purportedly representing interest payments on the certificates of deposit that petitioner had purchased. State and Federal taxes due on the quarterly interest payments received on the two certificates of deposit were paid by petitioner in the name of the trusts.

On July 10, 1990, Chemical Bank issued a renewal of a $1,184,000 certificate of deposit in the name of "Steven J. Romer, Trustee," not in the name of the trusts.

Neither of the Marion Family Trusts, nor any member of the Marion family, ever received from petitioner any repayment of

trust property or of the $4,087,000 originally transferred into the trusts.

As a result of the loss of the $4,087,000, each of the two Marion Family Trusts received $100,000 from the New York State Lawyers' Fund for Client Protection.

$975,000 Received From Ira Saferstein

In late January and early February of 1989, Ira Saferstein (Saferstein) transferred $975,000 to petitioner, as his attorney, and Saferstein instructed petitioner to purchase with the $975,000 two certificates of deposit on Saferstein's behalf. Saferstein understood that the certificates of deposit were to be held in trust on his behalf by petitioner.

In fact, however, petitioner purchased with the $975,000 two certificates of deposit in petitioner's name, not in the name of Saferstein. Petitioner used the two certificates of deposit as collateral to obtain a personal bank loan. Petitioner did not inform the bank that the certificates of deposit were not owned by him, and petitioner never obtained permission from Saferstein to use Saferstein's funds or the two certificates of deposit purchased with Saferstein's funds for collateral on a personal loan nor for any other personal purpose.

By letter dated late December of 1990 or early January of 1991, Saferstein informed petitioner that the certificates of deposit that petitioner was supposed to have purchased and to be

holding on Saferstein's behalf should not be renewed on their next maturity date of January 4, 1991.

In response to Saferstein's letter, petitioner gave Saferstein a copy of the letter that he had sent to Votano, quoted in part above, and petitioner added the following note to Saferstein:

> Ira, do not contact Sterling National Bank. There is no money there and the insurance company will use it as an excuse to avoid paying.

With the letter to Saferstein, petitioner enclosed a promissory note indicating that he owed Saferstein $1,144,740, representing the original $975,000 that petitioner had received from Saferstein plus accrued interest.

Saferstein never received back from petitioner any portion of the $975,000. As a result of the loss of the $975,000, Saferstein received $100,000 from the New York State Lawyers' Fund for Client Protection.

$1.2 Million Received From Judith Ripps

On June 19, 1990, Judith Ripps (Ripps), another of petitioner's legal clients, transferred $1.2 million to petitioner for the purchase on her behalf of a certificate of deposit at Chemical Bank.

Ripps never gave petitioner permission to use the $1.2 million, nor the certificate of deposit petitioner purchased with Ripp's $1.2 million, as collateral on his personal loans.

Ripps never received back from petitioner any portion of the $1.2 million. As a result of the loss of the $1.2 million, Ripps received $100,000 from the New York State Lawyers' Fund for Client Protection.

## $350,000 Received From Banks

During December of 1990, petitioner obtained $350,000 by writing checks on checking accounts at Chemical Bank and at Citibank over which petitioner had control, but in which accounts there existed insufficient funds to cover the checks petitioner had written. No portion of this $350,000 obtained by petitioner through this check-kiting scheme has been repaid to the banks.

During 1990, petitioner and his various controlled corporations sought and obtained loans from Chemical Bank and from Citibank for various real estate and other business activities in which petitioner and his controlled corporations were involved. In applying for the bank loans, petitioner represented to personnel of the banks that he had a net worth of at least $5 million.

## $575,000 Received From Bridgehampton Estates

On August 31, 1990, New Gold Equities Corp. (New Gold), a corporation controlled by petitioner, borrowed $4.5 million from

Bridgehampton Estates, Inc. (Bridgehampton), for the purpose of obtaining additional working capital. Petitioner personally guaranteed this loan, no portion of which has been repaid.

Of the total $4.5 million in funds obtained from Bridgehampton, at least $900,000 was deposited by petitioner into a checking account of New Gold maintained at Chemical Bank. After these funds were deposited into this New Gold account at Chemical Bank, checks drawn on the account required the signatures of both petitioner and Lloyd Goldman (Goldman), the majority stockholder of Bridgehampton.

Petitioner was not authorized to sign Goldman's signature on New Gold's checks, and petitioner was not authorized to use any of the funds loaned to New Gold by Bridgehampton for his personal purposes.

In connection with petitioner's application for the above loan from Bridgehampton, petitioner gave Goldman a personal financial statement reflecting that petitioner had over $5 million of cash in various bank accounts, a net worth of at least $16 million, and a gross income for 1990 of $610,000.

On three checks totaling at least $575,000 drawn on the account of New Gold at Chemical Bank (in which account the funds loaned by Bridgehampton had been deposited), petitioner forged Goldman's signature and, without permission of Bridgehampton or

of Goldman, petitioner obtained at least $575,000.[1]  Neither New
Gold nor Bridgehampton ever received a repayment of this
$575,000.

## $450,000 Received From William Marion

In 1990, William Marion loaned New Gold and Ryer Equities
Corp. (Ryer), another corporation controlled by petitioner,
$350,000 and $100,000, respectively, for renovation of apartment
buildings owned by each corporation.  These loans to New Gold and
to Ryer were personally guaranteed by petitioner.  Some interest
on these loans was paid but no payments of principal were made,
and the loans remain outstanding.

## Petitioner's Conviction For Embezzlement

On March 21, 1991, petitioner was indicted by a grand jury
of the County of New York on 14 counts relating to petitioner's
embezzlement of funds from Votano, the Marion Family Trusts,
Saferstein, and Ripps.

On December 9, 1991, after a 2-1/2 month jury trial,
petitioner was convicted in the Supreme Court of the State of
New York, New York County, on all 14 counts, and on January 6,
1992, petitioner was sentenced to concurrent prison terms, the

---

[1]  Although the evidence indicates that the total amount of the
three forged checks exceeded $575,000, respondent, without
explanation, has charged to petitioner with regard to these items
additional income of only $575,000.  We also use respondent's
figure of $575,000.

highest from 7-1/2 to 22-1/2 years.  Petitioner is now incarcerated in Sing Sing Correctional Facility, Ossining, New York, in connection with the above conviction for embezzlement.

On January 10, 1992, in a supplemental judgment and order of restitution entered by the Supreme Court of the State of New York, New York County, petitioner was ordered to make restitution to Votano, the Marion Family Trusts, Saferstein, and Ripps relating to the embezzlement for which he was convicted in the total cumulative amount of $7,028,000, as follows:

| Restitution Order In Favor Of | Amount |
|---|---|
| Gabrielle Votano | $ 741,000 |
| The Marion Family Trusts | 4,087,000 |
| Ira Saferstein | 1,000,000* |
| Judith Ripps | 1,200,000 |
| Total | $7,028,000 |

* Neither party offers any explanation of why the order of restitution provided $1 million with respect to Saferstein in spite of the fact that petitioner embezzled $975,000 from Saferstein.

Petitioner has not made any of the restitution payments required under the above judgment.

On April 28, 1994, petitioner's conviction was affirmed by the New York State Appellate Court.

The funds that petitioner received from his check-kiting scheme on the accounts at Chemical Bank and Citibank, by forging Goldman's signature on New Gold's checks, and as loan proceeds from William Marion, were not the subject of charges brought against petitioner in the above criminal proceedings.

On March 31, 1992, petitioner was disbarred by the State of New York.

## Petitioner's $23 Million Life Insurance Policy

As suggested in the above-referenced letter that petitioner gave to some of his clients, in the fall of 1990, petitioner applied for a $23 million life insurance policy with Metropolitan Life Insurance Co., which policy was approved on December 28, 1990.  On January 18, 1991, the policy was canceled because petitioner's check in payment of the January $7,363 premium was not honored.

## Petitioner's Federal Income Tax Returns And Respondent's Audit

As of December of 1990, petitioner had not filed his Federal income tax returns for the prior 15 years.  In early December of 1990, respondent's representative contacted petitioner and inquired as to petitioner's failure to file the above tax returns.  On January 2, 1991, petitioner untimely filed his individual Federal income tax returns for 1988 and 1989, and on January 3, 1991, petitioner timely filed his individual Federal income tax return for 1990.

On his untimely filed Federal income tax returns for 1988 and 1989, and on his Federal income tax return for 1990, petitioner reflected losses from his law practice, no other income, and no tax due.  On audit, respondent charged to petitioner as additional income the $7,003,000 that, in

- 14 -

petitioner's New York State criminal trial, was alleged to have been embezzled by petitioner from his clients and the total additional $1,375,000 that petitioner received through his check-kiting scheme, by forging checks on the New Gold account, and as loan proceeds from William Marion.

The schedule below reflects petitioner's Federal income tax returns as filed as well as the adjustments determined by respondent for each year:

|  | 1988 | 1989 | 1990 |
|---|---|---|---|
| Tax Return Reported Losses | ($ 1,650) | ($ 2,651) | ($ 94,292) |
| Respondent's Determinations: | | | |
| $7,003,000 Embezzlement Income As Alleged In State Court -- | | | |
| Gabrielle Votano | 741,000 | | |
| Marion Family Trusts | | 4,087,000 | |
| Ira Saferstein | | 975,900* | |
| Judith Ripps | | | 1,200,000 |
| $1,375,000 In Additional Income Adjustments -- | | | |
| Check Kiting | | | 350,000 |
| Bridgehampton Estates | | | 575,000 |
| William Marion | | | 450,000 |
| Total Adjustments To Income | $741,000 | $5,062,900 | $2,575,000 |

* As indicated, respondent's notice of deficiency made an adjustment of $975,900 with regard to petitioner's embezzlement from Saferstein. Respondent has not explained the $900 difference between the $975,000 petitioner embezzled from Saferstein and the amount of the above adjustment, and we treat the additional $900 reflected in respondent's notice of deficiency as having been conceded by respondent.

OPINION

Collateral Estoppel And Petitioner's Embezzlement Income

It is well established that gross income under section 61(a) includes income earned from illegal activity such as

embezzlement.  James v. United States, 366 U.S. 213, 219 (1961); Collins v. Commissioner, 3 F.3d 625, 629-631 (2d Cir. 1993), affg. T.C. Memo. 1992-478.

It also is well established that, based on petitioner's criminal conviction in New York State court, petitioner in this case is estopped from denying that he embezzled funds from his clients (namely, Votano, the Marion Family Trusts, Saferstein, and Ripps).  Allen v. McCurry, 449 U.S. 90, 94 (1980); Montana v. United States, 440 U.S. 147, 153-164 (1979); Parklane Hosiery Co. v. Shore, 439 U.S. 322, 331-333 (1979); Disabled Am. Veterans v. Commissioner, 942 F.2d 309, 312-314 (6th Cir. 1991), revg. 94 T.C. 60 (1990); De Cavalcante v. Commissioner, 620 F.2d 23 (3d Cir. 1980), affg. Barrasso v. Commissioner, T.C. Memo. 1978-432.

With regard, however, to the specific amount of funds that petitioner embezzled from his clients, the collateral estoppel effect of petitioner's State court conviction for embezzlement combined with the State court order of restitution is less clear. Arguably, the restitution order would appear to establish the specific amount of funds petitioner embezzled from each of the clients (namely, $741,000 in 1988 from Votano, $4,087,000 in 1989 from the Marion Family Trusts, $975,000 in 1989 from Saferstein, and $1,200,000 in 1990 from Ripps).  In Meier v. Commissioner, 91 T.C. 273, 286 (1988), which involved the collateral estoppel effect of a prior action for accounting of misappropriated funds, we held that both the fact of misappropriation and the specific

amount of funds misappropriated were established by collateral estoppel.

In petitioner's New York State court criminal prosecution, however, neither the indictment nor the judgment of conviction charged petitioner with embezzlement of any specific amount of funds from his clients. Further, the record in this case is lacking in information regarding the manner in which the order of restitution was adjudicated and issued.

On the record in this case, we believe it would be inappropriate to apply collateral estoppel to the New York State Court order of restitution and to base our findings as to the specific amount of embezzlement income petitioner received each year from his clients solely on the order of restitution, and we decline to do so. Allen v. McCurry, supra at 95; Zecchini v. Commissioner, T.C. Memo. 1992-8; Cipparone v. Commissioner, T.C. Memo. 1985-234; Keogh v. Commissioner, T.C. Memo. 1975-197.

However, for purposes of the tax deficiencies determined by respondent in this case, petitioner has the burden of proving by a preponderance of the evidence the actual amount of embezzlement income that he received in each year. Rule 142(a). The evidence indicates that petitioner embezzled from his clients essentially the same amount of funds that he was ordered to restore to his clients. The restitution amounts have been stipulated by the parties, and those stipulated amounts reflect essentially the same amount of embezzlement income that respondent has charged to

petitioner with respect to Votano (namely, $741,000 for 1988), with respect to the Marion Family Trusts (namely, $4,087,000 for 1989), with respect to Saferstein (namely, $975,000 for 1989[2]), and with respect to Ripps (namely, $1,200,000 for 1990). The evidence indicates (by, among other things, petitioner's own acknowledgment in the letter to his clients) that petitioner took control of these funds and that petitioner, without permission of his clients, misappropriated these funds and failed to repay his clients. Petitioner has failed to satisfy his burden of proving to the contrary. On the facts of this case, we sustain respondent's determination that the above funds should be charged to petitioner as taxable embezzlement income for each of the years indicated.

Petitioner alleges constitutional defects in the State court criminal trial leading up to his conviction, and petitioner argues therefrom that, in spite of his conviction and the restitution order, he should not be estopped in this proceeding from disputing his receipt of embezzlement income. We disagree. Petitioner has not established such fundamental flaws in his State court conviction that the doctrine of collateral estoppel should not apply to establish that petitioner embezzled funds from clients. 28 U.S.C. sec. 1738 (1988); Kremer v. Chemical

---

[2] As explained, with regard to Saferstein, the order of restitution reflected $1 million and respondent's notice of deficiency reflected $975,900. The amount stipulated by the parties and that we use is $975,000.

Constr. Corp., 456 U.S. 461, 481-485 (1982); Bertoli v.
Commissioner, 103 T.C. 501, 507-508 (1994).

Alternatively, with respect to the embezzlement income that
is covered by the State court order of restitution and by
petitioner's obligation to reimburse the New York State Lawyers'
Fund for Client Protection, petitioner argues that such
embezzlement income should not be taxable to him but that it
should be treated as having been converted into a nontaxable debt
obligation.  While it is true that restitution of embezzled funds
may give rise to an ordinary deduction for the embezzler in the
year of repayment, James v. United States, supra at 220, such
possible deduction in the year of repayment does not affect the
requirement that the embezzled funds be included in income in the
year of receipt.  In any event, petitioner has not repaid any of
the embezzled funds.

With respect to the $350,000 that petitioner obtained
through his check-kiting scheme and the $575,000 that petitioner
obtained by forging Goldman's signature on checks written on the
New Gold account, petitioner claims that his acknowledgment of
his obligation to repay these funds requires that all of these
funds now be treated in his hands as nontaxable loan proceeds.
As explained, however, by the Court of Appeals for the Second
Circuit in Collins v. Commissioner, 3 F.3d at 631:

> Loans are identified by the mutual understanding between the
> borrower and lender of the obligation to repay and a bona

fide intent on the borrower's part to repay the acquired funds.

The evidence does not establish that petitioner's receipt of $350,000 through his check-kiting scheme was based on consensual agreements between petitioner and the banks to the effect that petitioner could overdraw his accounts and later repay the banks, as petitioner contends.

Similarly, the evidence does not establish that petitioner's receipt of $575,000 by forging Goldman's signature was based on a consensual agreement between petitioner and Goldman to the effect that petitioner could forge Goldman's signature and treat the funds so obtained as a personal loan.

The sparse evidence in the record, however, with regard to petitioner's receipt of $450,000 from William Marion indicates (and respondent's brief so acknowledges) that these funds were obtained by New Gold and Ryer as a loan from William Marion. The facts that petitioner personally guaranteed the loan and the loan has not been repaid do not convert this $450,000 into taxable income to petitioner. The $450,000 that was borrowed from William Marion is not to be treated as taxable income to petitioner in the years before us.

In summary, each of respondent's adjustments to petitioner's 1988, 1989, and 1990 taxable income is sustained with the exception of the $450,000 loan proceeds from William Marion.

Fraud Addition To Tax For 1988 And Fraud Penalties For 1989 And 1990

Whether a taxpayer is liable for a fraud addition to tax or a fraud penalty constitutes a question of fact.

Fraud is never to be imputed or presumed. However, "its proof may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of record." Stone v. Commissioner, 56 T.C. 213, 224 (1971); see also Rowlee v. Commissioner, 80 T.C. 1111 (1983); Stephenson v. Commissioner, 79 T.C. 995 (1982), affd. 748 F.2d 331 (6th Cir. 1984).

The consistent understatement of substantial amounts of income over several years is strong evidence of fraud. Merritt v. Commissioner, 301 F.2d 484, 487 (5th Cir. 1962), affg. T.C. Memo. 1959-172; Vannaman v. Commissioner, 54 T.C. 1011, 1018 (1970). Any conduct, the likely effect of which would be to mislead or conceal, is indicative of fraud. Fraud must be proved by respondent by clear and convincing evidence. Sec. 7454; Rule 142(b).

Where fraud is established for a year, the 75-percent fraud addition to tax for 1988 under section 6653(b)(1) and (2) and the 75-percent fraud penalty for 1989 and 1990 under section 6663(a) and (b) apply to the entire tax deficiency unless the taxpayer establishes that some portion of the underpayment is not attributable to fraud.

Strong evidence of petitioner's fraudulent intent for each year in issue exists in this case. Petitioner was an experienced attorney. Petitioner certainly knew of his professional obligation to maintain client funds and investments separate from his own funds and investments. With the exception of the $450,000 obtained by petitioner as a loan from William Marion, petitioner received substantial income by embezzling funds from his clients, by kiting checks, and by forging signatures, none of which petitioner reported on his Federal income tax returns.

Petitioner failed to file Federal income tax returns for many years, and petitioner's Federal income tax returns for 1988 and 1989 were untimely filed only after petitioner was contacted by respondent's representative about the delinquent returns.

Petitioner's Federal income tax returns for 1988, 1989, and 1990 that were eventually filed were inaccurate and failed to report significant income that petitioner received in each year.

Petitioner's pattern of not reporting taxable income, along with the other factors mentioned, establish by clear and convincing evidence petitioner's fraud with regard to his Federal income taxes for 1988, 1989, and 1990. Holland v. United States, 348 U.S. 121, 137 (1954); Bradford v. Commissioner, 796 F.2d 303 (9th Cir. 1986), affg. T.C. Memo. 1984-601.

Further, petitioner has not satisfied his burden of proving herein that any of the income adjustments that we have sustained were not attributable to fraud. Accordingly, the 75-percent

fraud addition to tax for 1988 and the 75-percent fraud penalties for 1989 and 1990 are sustained and are applicable to each of the income adjustments that we have sustained.

Petitioner argues that the imposition against him in this case of a fraud addition to tax for 1988 and of fraud penalties for 1989 and 1990 would constitute double jeopardy and cruel and unusual punishment in violation of the 5th and 8th amendments to the U.S. Constitution. Petitioner's argument is without merit. See United States v. Alt, 83 F.3d 779 (6th Cir. 1996); Ianniello v. Commissioner, 98 T.C. 165, 176-187 (1992).

Other Additions To Tax

Also at issue are additions to tax under section 6661(a) for 1988 and under section 6651(a)(1) for 1989. Petitioner has not established under section 6661(a) that the underpayment for 1988, as reflected on the Federal income tax return that was filed for 1988, was based on substantial authority. For 1989, petitioner has not established under section 6651(a)(1) that the late filing of his return for that year was due to reasonable cause.

We sustain the imposition of each of these additions to tax.

Decision will be entered
under Rule 155.