ROCCO C. CIPPARONE and KATHLEEN M. CIPPARONE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Cipparone v. Commissioner
Docket No. 17364-81.
United States Tax Court
T.C. Memo 1985-234; 1985 Tax Ct. Memo LEXIS 397; 49 T.C.M. (CCH) 1492; T.C.M. (RIA) 85234; May 15, 1985. Howard Philip Newman, and Lowell E. Mann, for the petitioners. Russell K. Stewart and Paul J. Sude, for the respondent. SWIFT
MEMORANDUM FINDINGS OF FACT AND OPINION SWIFT, Judge: In a statutory notice dated April 15, 1981, respondent determined deficiencies in petitioners' Federal income tax liability and additions to tax as follows: Section 6653(b) [1]
Year
Deficiency
Addition to Tax
1974
$61.77
$30.88
1975 [2]
1,247.43
623.71
1976
6,833.92
3,416.96
1977
9,062.46
4,531.23
1978
2,711.84
1,355.92
The additions to tax under section 6653(b) for fraud were determined against petitioner Rocco C. Cipparone only. Following concessions, the issues remaining for decision are: (1) The applicability and effect of the doctrine of collateral *400 estoppel in this case; (2) whether petitioner Rocco c. Cipparone is properly taxable on unreported income arising out of an illegal kickback scheme that operated during the years 1974 through 1978, and if so, the amount of unreported income taxable to him; (3) whether petitioner is liable for additions to tax under section 6653(b); and (4) whether respondent's determinations with respect to the years 1974, 1975, and 1976 are barred by the applicable statute of limitations. FINDINGS OF FACT Some of the facts have been stipulated and are found accordingly. The petitioners, Rocco C. Cipparone and Kathleen M. Capparone, are husband and wife and resided in Philadelphia, Pennsylvania, at the time they filed their petition herein. Petitioners timely filed their joint Federal income tax returns for the years 1974 through 1978. Kathleen M. Cipparone is a petitioner in this case solely because she joined in filing those joint returns. Subsequent references herein to "petitioner" refer solely to Rocco C. Cipparone. The issues in this case arise out of events that occurred in the operation of the Philadelphia Traffic Court (hereinafter generally referred to as "Traffic Court") in Philadelphia, *401 Pennsylvania, during the years 1974 through 1978. Petitioner held various positions with the Traffic Court, beginning as a clerk, later becoming a department supervisor, and finally, Court Administrator. An illegal kickback scheme that operated out of the Traffic Court and that involved at least two other individuals, Dr. Robert Bacheler and Charles K. Vare, gave rise to the unreported income that was determined by respondent to be taxable to petitioner. The Philadelphia Traffic Court was a court of limited jurisdiction that existed pursuant to the Constitution and statutes of the Commonwealth of Pennsylvania. The Traffic Court exercised jurisdiction over all summary offenses arising under the Vehicle Code (or any other comparable ordinance of the City of Philadelphia) occurring within the City and County of Philadelphia, irrespective of whether or not the violator was a Pennsylvania resident. Dr. Robert Bacheler, (hereinafter referred to as "Bacheler") was employed by the Traffic Court as Chief Advisor from February, 1976, through 1978. From April, 1974, until February, 1976, he was employed by the Managing Directors' Office of the City of Philadelphia but performed all of *402 his work with the Traffic Court.Irrespective of his title, Bacheler was in fact the person who exercised the most control over the operations of the Traffic Court and the employees therein throughout the years in issue. Charles K. Vare (hereinafter referred to as "Vare") was a writ server for the Traffic Court throughout the years involved herein. Writ servers are individual independent contractors who are utilized by the Traffic Court to execute arrest and seizure warrants issued by the Traffic Court, normally by arranging for the towing and impounding of vehicles. As compensation for this service, the writ server received a fee of $4.00 per warrant, an amount that was set by statute. Because each ticket, when left unpaid for a period of time, eventually gave rise to a separate warrant, it was to the advantage of the writ server to be able to locate violators with many warrants outstanding. A computer service that contracted with the Traffic Court kept track of, amont other things, the number of violations outstanding for each person, and ranked them accordingly. The circumstances surrounding the origin of the kickback scheme involved herein are unclear, due to the conflicting *403 stories given by the participants. In any event, the basis of the agreement entered into was the Bacheler and petitioner would provide Vare with additional writ service work, and Vare, in return, would kickback a certain percentage of his fees to Bacheler and petitioner. Petitioner, who was the supervisor of the "two-squad" or out-of-state section of the Graffic Court in 1974, would channel an extremely high percentage of the work from that section to Vare, and Bacheler would do the same from the regular (in-state) warrant section. In addition, Bacheler would supply Vare with an advance list of the names of the top twenty violators from the "high volume scofflaw" list [3] prior to its publication in a local newspaper and allow Vare preferential access to the Traffic Court's computer, with which Vare could determine the locations where the tickets were issued, thereby improving his chances of apprehending the violators on the scofflaw list. The oral kickback agreement between petitioner and Vare was entered into *404 on or about November 1, 1974, and provided that Vare would split 40 percent of the fees earned from the additional two-squad work with petitioner and he would keep 60 percent. Within two months, however, the terms of the oral agreement expanded to include Bacheler, who provided additional work for Vare from the warrant department. At that point, the agreement provided that Vare was to turn over 40 percent of his fees to Bacheler and petitioner, who in turn, were to divide their share evenly, with each receiving 20 percent of the total fees. In June of 1975, the agreement was modified further to provide that Vare was to split 50 percent of his fees with Bacheler and petitioner, who were to divide their share evenly between them. This agreement lasted until the week of June 9, 1978. At that time petitioner was no longer to receive any fees, but Bacheler was to continue to receive 25 percent of Vare's fees through July 1978. The manner in which the fees were split between petitioner, Vare and Becheler was as follows: A person whose vehicle had been impounded was required to go to the Traffic Court and pay his total penalty (consisting of outstanding fines, court costs, and writ *405 server's fees) in order to order to obtain the vehicle's release. Under procedures established by Bacheler, the cashier would accept the payment (in check or cash) and issue a receipt to the violator. The cashier would then put cash in the amount of the writ server's fees from each payment in an envelope with the writ server's name and the case number on it. Envelopes containing fees from cases which originated out of the two-squad were sent to the two-squad. All other envelopes containing fees were kept at the warrant department where the individual writ server whose name appeared thereon would personally obtain them upon request. All of the envelopes in Vare's name at the two-squad and at the warrant department were delivered to Bacheler's office once a week. Vare would pick up the envelopes in his name at the warrant department and immediately take them to Bacheler's office. An employee of the two-squad, whoever happened to be available, would be instructed to deliver the envelopes bearing Vare's name from that department to Bacheler's office. Bacheler would make the division of the writ server fees delivered to him in cash in the envelopes. First, he would open all of the *406 envelopes and divide the cash into two equal piles. He would immediately give one pile (representing 50 percent of the total) to Vare, who was usually present at the time of the division. [4] Vare also would receive all of the receipts and opened envelopes.The other pile Bacheler would again divide into two equal piles. Becheler would then put cash from one of the piles immediately into his pocket, and according to his testimony, would "generally deliver the other pile to Cipparone in a day or two." Petitioner was not usually present during this division of money. On October 6, 1978, Becheler and petitioner were indicted by a Federal grand jury in Philadelphia, and each was charged with participation in the affairs of an enterprise, the activities of which affect interstate commerce through a pattern of racketeering activity, in violation of 18 U.S.C. 1962 *407 (c) and (d) (namely, the so-called "RICO" statute) and in violation of the Pennsylvania statute prohibiting bribery in official and political matters. Both were charged with receiving money from Vare in exchange for, in the words of the Pennsylvania statute, their "decision, recommendation and other exercise of discretion as a public servant, and as consideration for violation of a known legal duty as a public servant," [5] in connection with their duties at the Traffic Court. Bacheler was also charged with having received approximately $3,000 in bribes from an agent of the computer company that contracted with the Traffic Court. In addition, Bacheler was charged with two counts of subscribing to false tax returns in violation of section 7206(1). Vare was given immunity from criminal prosecution in exchange for testifying against petitioner and Bacheler. Both defendants were found guilty of each of the counts charged. Findings of fact and conclusions of law were entered by Judge Hannum of the United States District Court for the Eastern District of Pennsylvania on February 12, 1979. [6]
*408 Although the time frame is not entirely clear from the record herein, Vare destroyed many of the records of the Traffic Court pertaining to the years involved in this case. Although Vare thought the records should not be destroyed, he did so because Bacheler asked him to do it. Vare also took some of the money belonging to the Traffic Court, which represented fines that had been paid, but later repaid part of the fines taken.Bacheler requested Vare to sign a statement under penalty of perjury to the effect that Vare never gave any money to Bacheler. Although he knew it to be false, Vare did provide such a statement to Bacheler. OPINION Collateral Estoppel Issue
The first issue to be decided is the applicability, if any, of the doctrine of collateral estoppel to this case. This issue was raised by respondent in an amended answer filed with the consent of the Court, in response to petitioners' amendment to their amended petition, which raised the statute of limitations issue. The issue specificially concerns what effect petitioner's criminal conviction for engaging in a bribery conspiracy has on the present civil suit for redetermination of a determined tax deficiency. *409 The doctrine of collateral estoppel generally applies to prevent relitigation of an issue that was determined in an earlier suit on a different cause of action. See Commissioner v. Sunnen,333 U.S. 591 (1948); Fairmont Aluminum v. Commissioner,22 T.C. 1377 (1954), affd. 222 F.2d 622 (4th Cir. 1955). It has long been recognized that collateral estoppel in a civil case may be based on a judgment in a prior criminal case. Tomlinson v. Lefkowitz,334 F.2d 262, 264 (5th Cir. 1964); Amos v. Commissioner,43 T.C. 50 (1964), affd. 360 F.2d 358 (4th Cir. 1965). Collateral estoppel applies with respect to those facts that were actually litigated and determined in the first proceeding and which were essential to the judgment in the first case. Commissioner v. Sunnen,333 U.S. 591, 599-601 (1948); see Wright v. Commissioner, 84 T.C.     (No. 41) (1985). The fact that respondent *410 was not a party to the criminal case in which petitioner was convicted is not a bar to application of the doctrine of collateral estoppel because the requirement of mutuality was eliminated as a necessary prerequisite by the Supreme Court in Parklane Hosiery Co. v. Shore,439 U.S. 322, 331 (1979). A further limitation on the application of collateral estoppel is that it cannot apply with respect to any issue if the party against whom it is asserted did not have a "full and fair opportunity" to litigate that issue in the earlier case. Allen v. McCurry,449 U.S. 90, 95 (1980). Petitioner does not contest the fact that he was given every opportunity to litigate the issue of his participation in the bribery scheme in the Federal district court proceeding. We must therefore determine which of the findings of fact made by the Federal district court were "essential to its judgment" of guilt. See Commissioner v. Sunnen,supra at 601. In order to properly make that determination, we look to the statutes under which petitioner was convicted. The Pennsylvania statute applicable to petitioner's conviction is set forth below: *411 § 4701. BRIBERY IN OFFICIAL AND POLITICAL MATTERS (a) Offenses defined.--A person is guilty of bribery, a felony of the third degree, if he offers, confers or agrees to confer upon another, or solicits, accepts or agrees to accept from another: (1) any pecuniary benefit as consideration for the decision, opinion, recommendation, vote or other exercise of discretion as a public servant, party official or voter by the recipient; (2) any benefit as consideration for the decision, vote, recommendation or other exercise of official discretion by the recipient in a judicial, administrative or legislative proceeding; or (3) any benefit as consideration for a violation of a known legal duty as public servant or party official. (b) Defenses prohibited.--It is no defense to prosecution under this section that a person whom the actor sought to influence was not qualified to act in the desired way whether because he had not yet assumed office, had left office, or lacked jurisdiction, or for any other reason. 18 Pa. Cons. Stat. § 4701 (1973). Respondent asserts that we are bound by the findings of the Federal district court as to *412 the specific amounts of money received by petitioner and Bacheler. Petitioner argues that the Federal district court did not make specific findings as to the amounts of money he received, or alternatively, that such findings were not essential to the judgment. Our review of the findings of fact and conclusions of law entered by the Federal district court indicates that, with one exception (namely, 40 percent of the $1,350 received by Vare in November and December of 1974, or $540), there is no specific finding as to the amounts of money actually received by petitioner. At most, there is an "implication" (to use respondent's terminology) that the fees were split evenly between Bacheler and petitioner. Indeed, the findings contain the following passage, that would appear to cast some doubt on that "implication": "The general procedure was for Vare personally to deliver the money to defendant Bacheler who was to see that defendant Cipparone received his portion; however, Vare's daughter occasionally delivered payments to Bacheler's house during the summer of 1977." [Emphasis added.] Respondent cites a number of cases involving the collateral estoppel effect of a criminal *413 tax conviction on a subsequent civil tax proceeding. Such cases have no proper application to this case because petitioner herein has never been convicted of a tax crime. Respondent also cites Keogh v. Commissioner,T.C. Memo. 1975-197, for the proposition that convictions for receipt of monies through a bribery or embezzlement scheme give rise to the application of collateral estoppel, even in the absence of a criminal tax conviction. That case involved the collateral estoppel effects of a conviction for conspiracy to accept a bribe in violation of 18 U.S.C. section 1503. Although we agreed with respondent in that case that taxpayer was "estopped to deny that he received somefunds for his effort * * *" [34 TCM 844 at 851, 44 P.H. Memo T.C. par. 75,197 at 75-833, emphasis added], we also found that-- It is clear that the amount which [taxpayer] received was not essential to the judgment of conviction in the criminal case. [34 TCM at 851, 44 P.H. Memo T.C. par. 75,197 at 75-834.] Therefore, Keogh supports petitioner's position that the amount of money received is not "essential" to *414 a bribery or conspiracy conviction. We conclude that petitioner is estopped from denying participation in the bribery scheme itself. However, the specific amounts of money he received were not essential to his conviction because any "pecuniary benefit" or merely "benefit" would support a conviction under the applicable statutes. Therefore, petitioner is not collaterally estopped by the findings of the Federal district court as to the specific amounts of money received by him (to the extent such findings exist), but such findings are, of course, relevant evidence. Allocation of Income to Petitioner
We now consider the difficult issue of determining how much, if any, of the income from the kickback scheme is taxable to petitioner. Respondent alleges that with the exception of November and December of 1974 (during which time petitioner's split was allegedly 40 percent) petitioner received 25 percent of the total writ server fees generated by Vare from November, 1974, through June, 1978. The statutory notice of deficiency is based upon that determination. Therefore, respondent assumes that Bacheler did in fact split half of the fees he received with petitioner. Although *415 petitioner denies involvement in the scheme at all, petitioner argues, in the alternative, that if he is found to be involved in the kickback scheme, he in fact received far less money than respondent determined, because Bacheler did not divide the money evenly with petitioner. Given the factual circumstances of this case, we are inclined to agree and to agree with petitioner's alternative argument that petitioner actually received significantly less than what the oral agreement of the participants called for him to receive. Bacheler exercised a great deal of authority at the Traffic Court, and he was the one who controlled the actual division of the fees. Division of the fees, all of which had been previously converted into cash pursuant to procedures initiated by Bacheler, took place in Bacheler's office, without petitioner being present. Receipts were given to Vare, and not to petitioner. These factors, particularly when combined with Bacheler's control over Vare (which is demonstrated by Bacheler's order to Vare to destroy court records and his solicitation of a fraudulent statement from Vare that Vare never gave Bacheler any money) could easily have led Bacheler to enlist *416 Vare's assistance to cheat petitioner out of his share, or to have done so on his own initiative. However, our finding that petitioner actually received less money than what the oral agreement of the participants called for (regardless of what amount we might somehow estimate) does not aid petitioner under the circumstances of this case, at least with respect to the underlying deficiencies. We reach this conclusion because of the applicability of the partnership provisions of the Internal Revenue Code, which are contained in Subchapter K (sec. 701 et seq.), to the present case. Cf. Stern v. Commissioner,T.C. Memo. 1984-383. In section 761(a), the term "partnership" is defined in an expansive manner, as follows: [T]he term "partnership" includes a syndicate, group, pool, joint venture, or other unincorporated organization through or by means of which any business, financial operation, or venture is carried on, and which is not, within the meaning of this title [subtitle], a corporation or a trust or estate. *417 The Supreme Court set forth the test to be used in determining whether a partnership exists for Federal income tax purposes in Commissioner v. Culbertson,337 U.S. 733, 742 (1949), namely, whether "the parties in good faith and acting with a business purpose intended to join together in the present conduct of the enterprise." Under Culbertson,supra, we are to consider-- all the facts -- the agreement, the conduct of the parties in execution of its provisions, their statements, the testimony of disinterested persons, the relationship of the parties, their respective abilities and capital contributions, the actual control of income and the purposes for which it is used and any other facts throwing light on their true intent. [337 U.S. at 742]. We conclude from the record herein that petitioner, Bacheler and Vare intended to conduct a venture or enterprise jointly for profit. They therefore are to be regarded as partners for Federal income tax purposes. Partners are taxed on their distributive share of partnership taxable income in *418 the year such income is earned, irrespective of whether or to what extent they actually received distributions from the partnership. Section 702; section 1.702-1(a), Income Tax Regs. It is well settled that funds received as kickbacks as a result of extortion or bribery are includible in taxable income. Rutkin v. United States,343 U.S. 130 (1952). Partners are taxable on the full amount of their distributive share even where a partner is unaware that partnership income has been earned, and another partner has embezzled it without his knowledge. Commissioner v. Estate of Goldberger,213 F.2d 78 (3d Cir. 1954), affg. in part and revg. in part sub nom. Trounstine v. Commissioner,18 T.C. 1233 (1952); Stoumen v. Commissioner,208 F.2d 903 (3d Cir. 1953). This Court has expressly followed Goldberger and Stoumen in Beck Chemical Equipment Corp. v. Commissioner,27 T.C. 840, 855-856 (1957). *419 A partner's distributive share of taxable income is to be determined by the partnership agreement. Section 704(a). There is substantial evidence in this case, particularly from the findings of the Federal district court, of the existence of an oral agreement as to a division of Vare's writ server fees. Initially, the partnership consisted of Vare and petitioner, who split the proceeds 60-40 in November through December, 1974. Then, the partnership added Bacheler to its membership. Initially a 60-20-20 split for Vare, Bacheler and petitioner, respectively, the agreement was modified to a 50-25-25 split in March, 1975, and the agreement remained in that form through June, 1978. We find the Federal district court findings of fact to be the best available evidence as to the amounts of money received by the partnership. It is based upon those figures thatrespondent calculated petitioner's deficiencies. [7] Accordingly, petitioner is properly taxable on the amounts determined by respondent, (with the minor adjustment previously noted at fn.2, and subject to the statute of limitations defense *420 discussed below), regardless of whether respondent has established, to our satisfaction, that petitioner actually received those amounts. Fraud
The next issue for decision is whether the additions to tax under section 6653(b) that have been determined by respondent should be sustained. Section 6653(b) provides for an addition to tax of 50 percent of the underpayment if any part of the underpayment of tax was due to fraud. Respondent bears the burden of proving by clear and convincing evidence for each year in issue that (1) there was an underpayment of tax and (2) some portion of the underpayment was due to fraud. Section 7454(a); Rule 142(b). Fraud need not be established as to the entire amount of the underpayment; rather, if any part of the underpayment was due to fraud, the section 6653(d) addition to tax attaches to the entire deficiency. Otsuki v. Commissioner,53 T.C. 96, 105 (1969); *421 Shaw v. Commissioner,27 T.C. 561, 570 (1956), affd. 252 F.2d 681 (6th Cir. 1958). The existence of fraud is a question of fact to be resolved upon consideration of the entire record before the Court. Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion, 578 F.2d 1383 (8th Cir. 1978). In order to establish fraud, respondent must show that the taxpayer filed his return with the specific intent to evade a tax believed to be owed. Wilson v. Commissioner,76 T.C. 623, 633 (1981). Direct evidence of intention is rarely available and is not necessary. Fraud is never to be imputed or presumed; however "its proof may depend to some extent upon circumstantial evidence, and may rest upon reasonable inferences properly drawn from the evidence of record." Stone v. Commissioner,56 T.C. 213, 224 (1971). The consistent understatement of substantial amounts of income over *422 several years is strong evidence of fraud. Merritt v. Commissioner,301 F.2d 484, 487 (5th Cir. 1962); Vannaman v. Commissioner,54 T.C. 1011, 1018 (1970). Any conduct, the likely effect of which would be to mislead or conceal, is indicative of fraud. Spies v. United States,317 U.S. 492, 499 (1943). The failure to keep adequate records is indicative of an attempt to defraud. Papineau v. Commissioner,28 T.C. 54, 58 (1957). Respondent contends that petitioner's failure to report any income from the kickback scheme on his Federal income tax returns for each of the years 1974 through 1978 constituted fraud within the meaning of section 6653(b). [8] Petitioner contends that respondent has failed to carry his burden of proof with respect to the issue of fraud. For the following reasons, we agree with petitioner. *423 In the instant case, petitioner was convicted of participating in an illegal bribery scheme, and we have held that he is collaterally estopped from denying his participation therein. However, we have also held that we are not bound by the findings of the Federal district court as to the amounts of money actually received by petitioner, (to the extent that there were such findings) because findings as to the specific amounts of money were not essential to the judgment.Indeed, "any pecuniary benefit" (under 18 Pa. Cons. Stat. § 4701(a)(1) (1973)) or even any "benefit" (under subsections (2) and (3) of the same statute) would suffice for a conviction under the Pennsylvania statute to which the Federal racketeering statute refers. [9]
*424 Because of the applicability of the partnership provisions contained in Subchapter K, which operate to tax petitioner on his agreed share of the profits irrespective of actual receipt, we did not previously find it necessary to reach the issue of how much money petitioner actually received from the scheme. In the complete absence of any other evidence on the subject and in light of the partnership agreement, we adopted the findings of the Federal district court on the issue of the amount of fees received by the partnership as income, and upheld the respondent's use of the same in his statutory notice of deficiency. As previously noted, respondent has the burden of proof with respect to the issue of fraud, not by the usual standard of "preponderance of the evidence", but by the higher standard of "clear and convincing evidence." Section 7454(a); Rule 142(b). While the record herein supports a finding that petitioner was involved, to some extent, in the illegal kickback scheme described herein, and was therefore entitled (under the agreement) to his agreed upon share, respondent has not introduced sufficient credible evidence to demonstrate that petitioner actually received *425 any substantial amount of money, let alone the amounts of money determined by respondent. It is respondent's failure to prove that petitioner actually received any substantial amount of money that distinguishes this case from Keogh v. Commissioner,supra, which is relied upon heavily by respondent. In that case, this Court held that there was "clear and convincing" evidence that taxpayer received at least $17,500 on a specific occasion. [34 TCM at 852; 44 P.H. Memo T.C. par. 75,197 at 75-834.] There is no such evidence in this case. Indeed, the reasonable inference to be drawn from the circumstances of this case, as adduced from the evidence presented to us, is that petitioner did not actually receive substantial amounts of unreported income from the kickback scheme. Those circumstances include, (among others previously mentioned), the high degree of control exercised by Bacheler at the Traffic Court, the fact that Bacheler generally divided the money in his own office, the fact that petitioner was normally absent at the time the money was divided, the close personal relationship of Bacheler and Vare, and the demonstrated lack *426 of credibility and honesty on the part of both Vare and, particularly, Bacheler. Petitioner's testimony regarding his very modest standard of living throughout the years in issue, which we find to be credible and which was not seriously controverted by respondent, buttresses our conclusion that much of petitioner's "share" was retained by Bacheler. Petitioner testified at trial that he did not participate in the illegal kickback scheme at all. Petitioner did admit to having received a total of $5,100 from Bacheler over the span of some 45 weeks, but claims that the money represented payment for a car that he had sold to Vare. Vare had purchased a car from petitioner for $3,000 and agreed to pay petitioner $100 per week. Vare did not make the payments, and Bacheler agreed to make them on Vare's behalf. Petitioner claims that he initially thought the payments he received from Bacheler over the $3,000 sales price of the car were due to a "bookkeeping error," but then he decided to keep quiet about the overpayments. Petitioner testified that he was aware of a climate of corruption that existed at the Traffic Court, but had no one to report it to because there was no one he felt *427 he could trust. Although we do not believe petitioner's denial of participation in the kickback scheme in light of his criminal conviction, we found him to be a credible witness overall. In sharp contrast to Bacheler and Vare, both of whom frequently gave vague or nonresponsive answers while looking at the ceiling or back of the courtroom, petitioner would generally answer in a straightforward manner. Bacheler was a witness whom we found to be particularly lacking in credibility. For example, he initially denied having received any bribes from anyone other than Vare, but then changed his testimony and admitted to having received bribes from an official of the computer company with whom the Traffic Court contracted. At the trial of the instant case, Bacheler first denied having requested such a statement, and then changed his testimony and admitted that he had. Also, his memory was strangely selective - for example, he remembered that he paid money to an employee of the Traffic Court warrant department (who, Vare claims, originated the kickback scheme idea), but he could not remember why he paid the employee money. At the time he testified, Bacheler was waiting to hear from *428 respondent as to whether or not his then pending offer of compromise with the Internal Revenue Service would be accepted. He knew that acceptance of such an offer was discretionary on the part of respondent. His offer of compromise requested respondent to accept a $5,000 payment in order to extinguish a total outstanding liability of approximately $10,000. Bacheler had stipulated to this liability, which was calculated on the assumption that he received 25 percent of the total fees collected by Vare. The statutory notices of deficiency issued to Bacheler for the years 1975-1978 were based on the assumption that, with a few minor exceptions discussed supra, he divided the fees he received equally with petitioner, and it is very likely that he did not want to testify to anything that would contradict that assumption. He did, however, testify that the amount of income that respondent has determined that petitioner received was "way too high." At the time he testified, Vare also had large outstanding tax liabilities arising from the kickback scheme which he had not paid. His testimony was also far from credible. Vare testified that he has tried to forget about the events in *429 question. Considering carefully all of the evidence in this case, we cannot find petitioner's failure to report his share of kickback income, of which he may never have received more than an insubstantial portion, to be clear and convincing evidence of fraud.Petitioner was not very knowledgeable nor sophisticated with respect to tax laws, and it is therefore highly unlikely that he would have appreciated the legal requirement of reporting the "deemed" partnership income that we have concluded he is liable for. We therefore conclude that petitioner lacked the specific intent to avoid a tax believed to be owed, Wilson v. Commissioner,supra at 633, and we find for petitioner as to the section 6653(b) additions to tax for all of the years in issue. Statute of Limitations Issue
Petitioners, by way of an amendment to their amended petition, have raised the defense of the statute of limitations with respect to the deficiencies determined for the years 1974, 1975 and 1976. Respondent, in a supplementary brief, contends that this Court erred in allowing petitioners to raise this issue by amending their pleadings after trial and after final briefs were *430 submitted and now requests the Court to reconsider that ruling. The basis of respondent's request is that Rule 34(b)(4), which requires a party to set forth its assignments of error in its petition, was thereby violated. However, respondent ignores Rule 41(a), which provides in relevant part that "otherwise a party may amend his pleading only by leave of Court or by written consent of the adverse party; and leave shall be given freely when justice so requires." It should also be noted that the Court allowed respondent to raise a new issue (by amending his answer and submitting a supplemental brief on the collateral estoppel issue) at the same time petitioners were allowed to raise the statute of limitations issue. We reject respondent's request. Respondent asserts, in the alternative, that the years 1974 through 1976 are open and are not barred by the statute of limitations because of the presence of fraud (per section 6501(c)(1)), and also, with respect to 1976, because petitioners omitted in excess of 25 percent of their income (per section 6501(e)(1).) Respondent has the burden of proof on both of these alternative issues. Rule 142(b); Stratton v. Commissioner,54 T.C. 255, 289 (1970). *431 We have previously found that respondent has not proved the existence of fraud, nor has he provided specific proof that petitioners omitted in excess of 25 percent of their income in 1976. Petitioners reported on their Federal income tax return for 1976 gross income of $28,470.25, and respondent has not carried his burden of proving that petitioners omitted any specific amount from income for that year, let alone the $7,117.57 that would be required under section 6501(e)(1). The statutory notice of deficiency herein for all years in issue was issued on April 15, 1981. Petitioners timely filed their 1974, 1975, and 1976 Federal income tax returns. Respondent is barred by the applicable three-year limitation on assessments from assessing a deficiency with respect to the years 1974, 1975, and 1976. Section 6501(a). In summary, we find for petitioner, Rocco Cipparone, as to the additions to tax determined for the years 1974 through 1978 under section 6653(b). We find for petitioners as to the statute of limitations issue for 1974, 1975 and 1976. Lastly, we find for respondent as to the tax deficiencies determined for 1977 and 1978. Decision will be entered under Rule 155. *432 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years in issue, and all rule references are to the Tax Court Rules of Practice and Procedure. ↩
2. Respondent now concedes that the unreported income figures set forth in the statutory notice for 1975 are incorrect and that they should be reduced by $245.00.↩
3. A "Scofflaw" was a violator with ten or more violations outstanding. "High volume scofflaw" referred to a violator with one hundred or more violations outstanding.↩
4. Vare would not always receive 50 percent of the total, due to the fact that Bacheler would withhold money, at Vare's request, to help Vare pay various liabilities and also to save money to pay for the wedding reception of Vare's daughter. This was done, according to Vare, because "I couldn't keep any money in my pocket."↩
5. 18 Pa. Cons. Stat. § 4701, the text of which is set forth at pp. 11-12, infra.↩
6. Both defendants waived their right to a jury trial.↩
7. Petitioner's share of unreported income was determined to be as follows: ↩
Year
Amount
Year
Amount
1974
$270.00
1977
$20,985.50
1975
4,401.00
1978
6,171.00
1976
18,181.25
8. Respondent also argues that a stipulation entered into by the parties, to the effect that certain charitable deductions claimed by petitioners (for clothing allegedly contributed to the Salvation Army) were improper, constitutes additional "proof" of fraud. We do not consider that stipulation to have any material bearing on the fraud issue.↩
9. The Pennsylvania statute apparently has not been interpreted in such a way as to require any minimum or "substantial" amount of money. For example, in Commonwealth v. Tiberi,361 A.2d 318, 239 Pa. Super. 152↩ (1976), the defendant was convicted under the predecessor to the statute of receiving a mere $100 under color of office in return for promising to recommend an employee for advancement within the Pennsylvania Department of Transportation.